## .WOLF et al. v. BALDWIN.

THE *actual possession,* by virtue of which parties obtain the title of the city of San
Francisco to the pueblo lands under the second section of the Van Ness Ordi-
nance, means a possession accompanied with the real and effectual enjoyment
of the property; that possession which follows the subjection of the property
to the will and dominion of the claimant to the exclusion of others; and this
possession must be evidenced by *occupation or cultivation; or other appropriate
use,* according to the locality and character of the particular premises.   An
inclosure, by an ordinary fence, of the premises, without residence thereon,
or improvements, or cultivation, or other acts of ownership, is of itself insuf-
ficient.

A mere inclosure by a fence is of itself only the declaration of an intention to appro-
priate and possess the premises; but does not, unaccompanied with any other
acts, constitute the *actual* possession contemplated by the Ordinance.

The object of the Van Ness Ordinance was to protect actual possessors—parties
seeking, by settlement, to build up homes within the city limits.

The Van Ness Ordinance does not limit the quantity of land to which the actual
possessor acquires the title of the city; and the Courts cannot annex any lim-
itation, but can only hold parties to clear proof of their actual possession.

The proof of actual possession in this case is insufficient to enable plaintiffs to
recover.

The nature of the possession required by the Van Ness Ordinance discussed in the
opinion of BALDWIN, J.

*City and County of San Francisco* v. *Beideman* (17 Cal. 443) commented on, and
shown not to conflict with the decision here, by BALDWIN, J.

APPEAL from the Fourth District.

This is an action of ejectment to recover the possession of a fifty
vara lot, No. 1353, situated in the city of San Francisco, on Turk
street, between Hyde and Larkin streets.

The complaint alleges possession of the lot by plaintiffs on the
first day of August, 1860, and ouster by defendant on the same
day without any averment of title.   The answer denies specifically
the allegations of the complaint.

Plaintiffs relied, on the trial, on possession from an inclosure by
a fence put up in December, 1853, and the Van Ness Ordinance.
As the case turns entirely upon the question of actual possession
under the Van Ness Ordinance, the substance of the evidence on
this point of the several witnesses produced is given.

Moses Whitcomb testified, that in conjunction with one Gauley,
he purchased the lot in question of Barney Holland, and received

a deed from him; that he sold the lot in December, 1853; that he had no recollection of putting the party purchasing in possession when he sold it; that there was a fence around it then; and he thought the kind of fence was posts, probably ten feet apart, with two by three inch joists, one on the top and one on the side, and that this was the most common kind of fence at the time.

The plaintiffs' counsel then admitted that all the title Barney Holland had to the lot was a Peter Smith title, derived from a sale under a judgment recovered against the city.

James A. Gauley testified, that he knew lot No. 1353; that Whitcomb and himself purchased the lot in June, 1853, from Barney Holland, and sold it to Wolf for $1,100, and paid five hundred and ten dollars in June, 1853, for lumber to fence it.

Walter W. Stone testified, that he was a carpenter in 1853, and fenced in the lot somewhere in June, 1853, nearly all the lot, for one Gautier (the holder of a tax title); that as near as he could measure, the posts were three by four inches and the rails two by three inches; that he put on two rails; that he had not seen the fence for four or five years; that he saw it a year after it was built, and that the fence was then standing.

On cross examination, the witness further testified that he was confident he had seen the lot since 1853, but did not recollect seeing it since the fall of 1854; that the fence was a good fence of the kind; but could not swear that the fence he saw in 1854 was the same fence.

Mr. Oppenheim testified, that he examined the lot between the fifteenth of November and December, 1853; that it was then fenced in, and that the fence was like the fences round there, the posts ten feet apart and two rails; and that he was out there several years after there was a fence around it.

On cross examination, the witness further testified, that he was around the valley in 1856; did not go particularly to this lot; did not go on the east of it; did not think he was on the lot west of it; was all around the valley; did not notice the lot particularly; could not say that it was fenced in 1856; could state positively that it was fenced in the spring of 1855; only had business with this lot when he sold it; don't think he is mistaken that this lot was fenced

in the spring of 1855; did not pay attention how much of the lot was fenced, and what he meant was that *the fence was up along the road; he did not see the rest.*

H. Pincus testified, that he knew the lot in question in 1853; it then had a fence, like all the balance of the fences, around it.

Thomas Arthur testified, that he knew the fifty vara lot, No. 1353; that it is now in very much the same condition as when he left it several years ago, except that some one has cut a little of the brush off of it, and put another fence on it; he first went to see this lot in the summer of 1853 at the request of Mr. Whitcomb; a surveyor went with him who surveyed the lot; he (witness) carried the chain; after that, some two or three days, he went and bought lumber and fenced the lot; he put up a two rail fence, that is, two boards; it was of Oregon pine lumber; the posts were four by four inches, and he thinks the posts were redwood; the boards were six inches wide and one inch thick; he enclosed four sides of the lot with the fence; he did it for Mr. Whitcomb, and at his request, who paid him for it.

George B. Turner, the County Surveyor, testified, that he surveyed the lot in April, 1860, for plaintiffs, and that there were then upon it some remains of an old fence.

For the defense, William J. Dodge testified, that he knew the lot No. 1353; had resided on the corner of Tyler and Larkin streets since the Spring of 1855; has owned several fifty vara lots near the lot in question since 1853–4; has a house on the lot, in which he lives; it is a little to the left and faces the lot in question; he never saw any fence around the lot in question; if there had been a fence there in 1854, or since, he could not help seeing it; there is one fifty vara lot between this and the way he comes to town, and he has been in the habit of passing back and forth by the lot from two to five times a day; that there was a fence put up by defendant last year; he saw it as soon as put up; has seen it frequently; never saw any fence there until last year; saw no other improvements there; his house is within a common rifle shot, and standing in the door he can see the lot in question almost in front; there is one fifty vara lot intervening between his house and the lot in question.

On cross examination, witness testified that his attention was first called to the lot in 1854; he had some neighbors residing near it; he never noticed any fence or any part of a fence around the lot in question, on either portion of the lot since 1854, until the fence of last year by Baldwin.

Paul Hertzberger testified, that he resides on the lot adjoining the lot in question; has lived there from the latter part of 1856; there have been no improvements on the lot in question since he has been there, excepting the fence put up last year; that he passes through the lot morning and evening every day, and never saw any fence there or house or inclosure before Baldwin's, and that he used to go out through the lot once or twice *a year for years before he went to live* where he now does, and he never saw any fence there or any improvements.

James M. Hurlburt testified, that he resided near the lot in question since June, 1858, and that there have been no improvements on the lot since he has been there until last year; if there had been any fence he would have seen it.

The testimony here closed; the jury rendered a verdict for the plaintiffs. A motion for a new trial on the ground, among others, of the insufficiency of the evidence to justify the verdict, and that the verdict was against law, was made, and was overruled; and judgment was entered upon the verdict. From the judgment and the order denying a new trial, the defendant appeals.

*D. W. Perley*, for Appellant.

I. The only material facts of the case were whether the plaintiffs had actual possession at the date alleged, and whether they were ousted or expelled by defendant. Upon these two facts the plaintiffs must recover, or they cannot recover at all. They do not allege any title or right of possession, but solely an actual possession and ouster.

The proof on those points is as follows: 1st, that, in 1853, the plaintiffs purchased the lot from Whitcomb and Gauley; 2d, that Whitcomb and Gauley purchased it of Barney Holland in the same year; 3d, that Barney Holland had no title except as a purchaser

on a Sheriff's sale under a Peter Smith judgment against the city.

Unless these deeds gave the plaintiffs possession, they never had any possession either in law or in fact.

Although the complaint is based entirely on actual possession, plaintiffs would be allowed to show a valid title emanating from the sovereign power in support of the averment, if they had a title that would give them a legal seizin and possession ; for the title draws to it the possession, and would enable them to maintain the action. The deeds were offered to show either title or possession.

If they were admissible for any purpose, the defendant has a right to rebut them by showing that they were nullities.

This was decided in *Hart* v. *Burnett*. (15 Cal.) The Court say :

"A defendant in ejectment, holding such lands merely by possession, may set up the invalidity of such sales, or the plaintiff's title, derived therefrom, to defeat the plaintiff's action."

These deeds, then, being null and void, conveyed no title ; and the plaintiffs who claim under them are chargeable with notice of their nullity. (*Woodworth* v. *Fulton*, 1 Cal. 295.) Of course, they gave no legal seizin or constructive possession of the lot. It is still more palpable that they gave no actual possession. A deed which is a nullity never yet gave actual possession to anybody.

It is manifest that, so far as plaintiffs' claim to possession depends on the deeds, it entirely fails.

II.   The only act of possession performed by Whitcomb and Gauley, was building a two-board fence, with two by three posts ten feet apart, in December, 1853.

They never built a house on it, never occupied it, never improved it in any way. This fence, wholly insufficient for any purpose, was the sole act attempted to be proven.

So far as plaintiffs are concerned, they never performed any act of possession whatever. There was no delivery of possession by Whitcomb and Gauley. The plaintiffs never lived on, occupied, fenced, cultivated or improved the lot in any way whatever. It does not appear that the plaintiffs were ever on the lot ; they never had any personal, corporeal possession, or any visible signs of occupancy.

If the fencing alone could give possession, in order to be effectual, and to confer title on plaintiffs under the Van Ness Ordinance, it

must have existed on the first day of January, 1855, and been continued down to June 20th, 1855.

Between 1855 and August, 1860—a period of five years—there is no proof that any fence existed. There is no proof that, during that long interval, the plaintiffs ever exercised the slightest act of possession or ownership.

If the only way in which the possession was originally acquired was by this fence, what became of the possession when the fence disappeared? There is no legal presumption in favor of its contiuance; for the legal title, according to plaintiffs' own showing, was in the city. Their possession was a matter of proof, and they were compelled to prove it *stricti juris*, as it was upon that alone they could recover.

III. The defendant did not enter upon this actual possession of plaintiffs and oust them. It affirmatively appears from evidence that they were not in possession at the time defendant entered.

IV. To acquire possession, there must be the will or intention to acquire it, and the occupation or actual detention of the thing. Actual possession is that which is accompanied with the real and effectual enjoyment of an estate, with the reception of its fruits, and is contradistinguished from imaginary or fictitious possession.

Possession implies a right and a fact—the right to enjoy annexed to the right of property, and the fact of the real detention of the thing in the hands of the master, or of another for him.

These are civil law definitions cited and approved in *Sunol* v. *Hepburn* (1 Cal. 265).

This act of fencing constituted no actual possession within any of the recent authorities of this Court.

To constitute such possession " there must be an actual, *bona fide* occupation—a *possessio pedis*—a subjection to the will and control, as contradistinguished from the mere assertion of title and exercise of casual acts of ownership." (*Plume* v. *Seward*, 4 Cal. 94; *Garrison* v. *Sampson*, 15 Id. 560; *Coryell* v. *Cain*, 16 Id. 568.)

The opinion of the Court, in *Beideman* v. *San Francisco*, (17 Cal. 463) is conclusive that plaintiffs had no possession of this lot.

Upon the vital and material fact of possession, the plaintiffs' case utterly fails. The Van Ness Ordinance was intended to protect the actual possessors on the first day of January, 1855. It recognizes no prior possession, except it was both actual and continued down to the twentieth day of June, 1855, except such actual possession had been interrupted by a trespasser or intruder.

If a man had the actual possession in 1853, and then ceased to have it in 1854, and another person then acquired it peaceably, and held it on the first day of January, 1855, he could not be ejected by the first possessor under the provisions of that ordinance.

*Henry J. Labatt,* for Respondent.

I.    The plaintiffs seek to recover by virtue of a prior possession from December, 1853, and uninterrupted in them, until about August, 1860, when defendant entered, and by virtue of the Van Ness Ordinance confirming the title of the city of San Francisco to the then actual occupant on or before January 1st, 1855.

We produce a chain of evidence clear, distinct, corroborative and unimpeached, of seven persons, the men who sell, the brokers, and the men who fenced the lot, and of the County Surveyor, showing that the lot was fenced in December, 1853, when plaintiffs bought and entered into possession. Some of the witnesses saw the fence at different times afterwards. Oppenheim saw it in 1855. The County Surveyor saw remains of the fence as late as April, 1860, when plaintiffs employed him to survey the lot.

II.    Plaintiffs did not abandon the lot, for being in possession in December, 1853, and their possession continuing uninterrupted on and after January 1st, 1855, they acquired the legal title, and there is no abandonment of a legal title because a fence decays.

Where two parties rely upon possession solely as proof of title, the presumption of ownership is in favor of the first possessor. Proof of possession, however short, will entitle a claimant to recover, unless the defendant can account for that possession, or show a prior possession or title in himself or a third person. (*Potter* v. *Knowles,* 5 Cal. 87, citing from Adams on Ejectment.)

Possession is always *prima facie* evidence of title, and proof of

prior possession is enough to maintain ejectment against a mere naked trespasser. (*Hutchinson* v. *Perley*, 4 Cal. 34; *Hicks* v. *Davis*, 4 Id. 69; *Winans* v. *Christy*, 4 Id. 78; *Plume* v. *Seward*, 4 Id. 96; *McMinn* v. *Mayes*, 4 Id. 210; *Bequette* v. *Caulfield*, 4 Id. 278; *Ramirez* v. *Murray*, 4 Id. 293; *Norris* v. *Russell*, 5 Id. 250; *Grover* v. *Hawley*, 5 Id. 486; *Covillaud* v. *Tanner*, 7 Id. 39; *McCarron* v. *O'Connell*, 7 Id. 153; *Bird* v. *Dennison*, 7 Id. 302; *Merced Mining Co.* v. *Fremont*, 7 Id. 302; *Bird* v. *Lisbros*, 9 Id. 5; *Nagle* v. *Macy*, 9 Id. 427.)

FIELD, C. J. delivered the opinion of the Court—COPE, J. concurring.

The only question which we consider it is necessary to determine for the disposition of the present case is, whether the evidence produced by the plaintiffs was sufficient to show that they had such possession of the premises in controversy as to entitle them to the benefits of the Van Ness Ordinance. By the second section of that ordinance the city of San Francisco relinquished and granted all her right and claim to the lands within her corporate limits, as defined by the charter of 1851, with certain exceptions, to the parties in the *actual possession* thereof, by themselves or tenants, on or before the first of January, 1855, provided such possession was continued up to the time of the introduction of the ordinance in the Common Council; or if interrupted by an intruder or trespasser, had been or might be recovered by legal process. By actual possession, as the terms are here used, is meant that possession which is accompanied with the real and effectual enjoyment of the property. It is the possession which follows the subjection of the property to the will and dominion of the claimant to the exclusion of others; and this possession must be evidenced by occupation or cultivation, or other appropriate use, according to the locality and character of the particular premises. An inclosure, by an ordinary fence, of the premises without residence thereon, or improvements or cultivation, or other acts of ownership, is of itself insufficient. An inclosure of this character is by itself only the declaration of an intention to appropriate and possess the premises; it does not, unaccompanied with any other acts, constitute the *actual* possession

21

which the ordinance contemplates. (*Elliott* v. *Pearl*, 10 Pet. 441; *Plume* v. *Seward*, 4 Cal. 95.)

Tested by these views, the plaintiffs entirely failed to establish any actual possession of the premises in controversy. They proved that they purchased in 1853, and that the parties through whom they claimed had built a two board fence around the premises. There was no evidence that the fence was in existence as late as 1855, except that given by one witness who could not testify positively upon the subject, and who limited his statement, such as it was—made from an imperfect recollection—to the fence on one side of the lot. On the other hand, parties residing in the immediate vicinity of the premises testified that there was no fence on the lot in 1854, or subsequently. But laying this testimony of the defense entirely aside, the evidence produced by the plaintiffs was obviously insufficient. It was not shown that they, or the parties through whom they claim, ever occupied the lot, or improved it, or cultivated it, or subjected it to any uses whatever. To have availed them, the inclosure should have been followed by some appropriate and continued use of the premises. If upon the flimsy evidence produced by them, the plaintiffs could recover, the Court would teem, as is well observed by counsel, with cases brought by squatters, who from 1849 to 1854 made temporary locations on the pueblo lands, which they had abandoned long before the passage of the Van Ness Ordinance. The object of that ordinance was to protect actual possessors—parties who were seeking by settlement to build up homes within the city limits, and not migratory squatters or mere land speculators. The possession required by its provisions must not only have been actual on or before January 1st, 1855, but must have been continued up to the period when the ordinance was introduced into the Common Council, unless interrupted by a trespasser or an intruder.

It is to be regretted that the ordinance did not fix a limit, in feet or lots, to the quantity of land of which the possessor might acquire the title of the city. But having declared that the title should go to the extent of the actual possession, it only remains for the Courts to hold claimants to clear proof of such possession.

Judgment reversed, and cause remanded for a new trial.

BALDWIN, J.—I agree in the conclusions of the Chief Justice and the reasoning by which they are supported.

The Van Ness Ordinance assures parties in "actual possession" of land of the city on the first of January, 1855, and continued until the ordinance was introduced into the Common Council, all the right and title of the city to the lots in such possession, subject to some limitations and exceptions not necessary to be noticed here. The policy of the ordinance was liberal, and designed for the benefit of persons who had taken up the land for the purpose of settlement. No limitation of quantity was made, and the Court has no power to annex any to the grant. No definition is given in the act of the phrase " *actual possession*," unless it be that furnished by an expression in the proviso to the first section of the act, in which the words " *occupied and possessed* " are used in connection with the holding of the land by a tenant or tenants.

*Prima facie*, the city is entitled to the lands within her boundaries ; and it rests with those claiming through a grant from her, under the provisions of this act, to show a compliance with the terms and conditions on which, and on which alone, the law vests the title. "Actual possession" of the claimed premises on the first of January, 1855, thus continued, is sufficient to make out this title ; and the only question is, What constitutes this *actual possession?* If the word *occupancy* had been used, probably the plaintiff suing must have shown that he or his tenant resided or had his domicil on the premises ; but that term is not used ; and the legal meaning of the terms employed, " actual possession," is different from that of this phrase. But it is equally clear, that a mere constructive possession will not do. If this were so, the qualifying adjective, " *actual*," is senseless. Effect must be given to all the words, and to the whole spirit and intention of the act. The property, at the given date, must have been subject to the will and dominion of the claimant, unless in cases where the possession was interrupted as explained in the ordinance. Now, it would seem that no great difficulty should be experienced in ascertaining whether a given person was in " actual possession " of a lot of city property in January, 1855. If he resided on a lot, with defined boundaries or ascertained limits, the fact of his residence, improvements, etc.,

there at the time could be easily proved, or the contrary disproved. It would seem almost impossible to manufacture a case which would falsify the truth as to such a fact, for if he resided on the place he must have had a house or dwelling of some sort there, and if this building be not now, or at the time of the trial, standing, some marks or remains of it could probably be found.   If the claimant asserts that he had " actual possession " by means of inclosure, he must show a substantial inclosure existing at that date ; and if he did not reside within it, and had no tenement or dwelling there, nor cultivated the land, or used it for any useful purpose—as a garden, or orchard, or ranch—this mere fact of his once having built a fence around the lines would not be enough to show an actual possession within the act.   It is not enough that he once had a fence there, when that fence has disappeared, and he did nothing further to show a dominion, or claim, or use of the premises.   Nor could a claimant go off after making some trifling improvements, and make a deed to some one else, and then either claim himself, or his assignee claim—nothing else being done by either—a title to the premises.   If the claimant merely built a hut or shanty, and then went off, or suffered the improvements to disappear or go to decay before the time mentioned, this is proof of abandonment, and he could not claim afterwards that he was entitled to the benefit of the act.   Nor could a man, as intimated before, because some time prior to January, 1855, he put up a slight fence to denote his appropriation of certain grounds, and did nothing more, and had no residence on the premises, maintain his pretension.   A fence, of itself, is not actual possession, nor is a fence in all cases necessary to such a possession.   The putting up of a fence is proof that the party designed at the time to appropriate the land, and to exclude others from the use of it.   (*Ellicott* v. *Pearl,* 10 Pet. 441.)   But it is not necessarily an act of exclusive dominion.   A party may have possession without any fence ; as, for example, where he claims a lot under a deed, and the lot is described and known by a number, and he has taken possession of and occupies a part, under claim of the whole.   But as against the legal seizin of the city, it cannot be maintained that *the mere putting up of a fence* around one acre of ground, and doing nothing more, is any actual posses-

Wolf *v.* Baldwin.

sion of all so inclosed ; for the city had a right to put a fence around the inclosure of the plaintiff, and he could not have objected. If there could be any title under the act *from the mere fact* that the claimant had a fence around the premises on the first of January, 1855, it must be shown affirmatively that at that time the fence was a substantial inclosure, which not only indicated a purpose of appropriation, but was of such character and quality as to exclude intrusion by persons or cattle upon the premises ; in other words, that it afforded means of defense, of itself, against intrusion or ingress by either.    (*Plume* v. *Seward*, 4 Cal. 95.)    In every case in which the claimant cannot show that in January, 1855, he was residing on some part of the claimed premises, by himself or tenants, or used them for some substantial business purpose to which the lot was adapted, or that he had a fence around the premises so substantial and permanent as to exclude cattle and persons, then the intendment is that he had no actual possession within the meaning of the ordinance.    And even if he had a substantial inclosure, effectual for all purposes of exclusion of persons and cattle on the first of January, 1855, if there was no other act of use or cultivation, and no occupancy of any part, it is not necessary to decide that this would of itself be sufficient to give the actual possession contemplated by the ordinance.

If there be special facts which go to show that the claimant, notwithstanding he does not come up to the requirements as here given, has a right to the property, these special facts must be shown ; but as a general principle governing such cases, we hold that the claim, in the absence of these facts, is unfounded.    No equivocal or scrambling possession will do ; but it must be a possession so held and evidenced that, in the absence of the Van Ness Ordinance, the party holding or claiming it could, after the lapse of the legal period, invoke in his behalf the Statute of Limitations, as against the holder of the adverse title, if that holder were a private person. It must, in other words, be an open, unequivocal, actual possession, notorious, apparent, uninterrupted and exclusive, carrying with it the marks and evidences of ownership, which apply in ordinary cases to the possession of real property.

There can then be no actual possession, within the meaning of

the ordinance, *as a general rule*, unless the party claiming had, on the first of January, 1855, occupancy by himself or some tenant residing on the premises, or was in the use of them as before explained.   He must either have been upon the premises at the given periods, by himself or tenant, or in the use of the premises according to the nature of his business or the nature of the premises, for some purpose for which they are adapted—as a ranch, garden, tanyard, orchard, or something of this kind.   Or, if occupying, by himself or tenant, a part of a lot or tract with defined boundaries, under a deed or deeds, he has inclosed the tract, and used a part for cultivation or otherwise—thus indicating a claim and appropriation of all by the use and claim of a part as parcel of a general tract—this, perhaps, would be enough to show that actual possession of all, which the ordinance requires to perfect his title.   It is possible that this definition and these illustrations will not embrace every case within the meaning of the ordinance, nor exclude every case which is not within it; but these suggestions and rules may furnish guides for the decision of most of the cases which will arise under the ordinance ; and it is not possible, as justly observed in the Pennsylvania cases, to prescribe rules on so complex a subject, which will apply without exception to every case which may occur ; but exceptional cases must be left to be decided when they are presented.

Nothing in this opinion contravenes anything said in the *City and County of San Francisco* v. *Beideman* (17 Cal. 443); for the facts in that case, as shown by the affidavits, brought it within the principle already announced ; and the Court endeavored in the opinion in that case cautiously to preclude the presumption, that a claimant, making the pretension here set up, could be within the ordinance.   In that case we said : " It is not necessary to define what constitutes an actual possession within the meaning of this ordinance ; indeed, it is almost impossible to give a definition which would apply to and cover all claims within the meaning of the ordinance, and include none which do not so come.   When we look into the various proofs of this case, in the shape of affidavits, we have no hesitation in concluding that the weight of the testimony does show such a case on the part of the defendant as would bring

Wolf v. Baldwin.

him within the ordinance, and authorize the dissolution of the injunction. An actual inclosure, the defendant residing or having tenants and a dwelling within it, the continued claim to the property, holding a deed purporting to convey the title, selling a portion, using a portion for a milk ranch or other agricultural purposes, the laying off of the property into lots, making leases, and the occupation of tenants, fencing in smaller portions of the tract, and repeated acts of dominion over different parts of it—these acts, continued or done at intervals for a series of years, would seem conclusive of the fact of actual possession, and would not be rebutted by the mere fact that occasionally an exterior fence was out of repair, or that it was not always sufficient to prevent forcible intrusion into the premises by persons or cattle ; nor would it be rebutted by an occasional trespass upon small parcels of the tract, committed by persons setting up no title save that of mere entry and possession. We do not mean to say that any one of these acts, much less that an inclosure only sufficient to mark a line of boundary, would be enough, nor that even a substantial inclosure, which might at the time of making it have been sufficient to keep out men and cattle, would alone be sufficient if the party making it did nothing more, and especially if he abandoned or never lived on the premises, or made no improvements, or indicated no purpose of occupation by himself or tenant ; but this is not the case here, and it is not necessary to pass upon such a question. We think, however, a concurrence of all the acts to which we have made reference does bring the case within the principle, and that the preponderance of the proofs is greatly in favor of this state of things." The principles here asserted are supported, not only by previous decisions of this Court, but an array of authorities leading to the same conclusion from the English and American Courts. It is not necessary to cite them here. They are collected in the appendix to Adams on Ejectment, 570, et seq.—title Adverse Possession.